UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KRISTEN MARISSA MILLIKEN,

                           Plaintiff,                        **19 Civ. 09371 (PED)**

          - *against* -                               <u>**DECISION AND ORDER**</u>

ANDREW SAUL,
 Commissioner, Social Security Administration,

                           Respondent.

**PAUL E. DAVISON, U.S.M.J.:**

## I.  INTRODUCTION

Plaintiff Kristen Milliken brings this action pursuant to 42 U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security ("Commissioner" or "agency") granting in part and denying in part Plaintiff's application for Disability Insurance Benefits ("DIB"). [Dkt. 1.] This matter is before me for all purposes pursuant to a Notice, Consent and Reference of a Civil Action to a Magistrate Judge entered on November 15, 2019. [Dkt. 10.]

Plaintiff filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) to reverse the Commissioner's determination that Plaintiff's disability had ended on April 23, 2019, and, therefore, she was not entitled to DIB after that date. Plaintiff moved to remand the case for calculation of benefits or, in the alternative, for further administrative proceedings. [Dkt. 12, 13.] The Commissioner filed a cross-motion agreeing to reverse his decision but asks that the case be remanded for further administrative proceedings. [Dkt. 17.] Plaintiff filed a reply seeking remand solely for calculation of benefits. [Dkt. 18.] For the reasons that follow, Plaintiff's motion is **GRANTED**, the Commissioner's motion is **DENIED**, and the matter is remanded to the agency for calculation of benefits.

## II.  BACKGROUND

Plaintiff is a young woman who has had a long history of spinal impairments, among other medical issues.  [R. 465.][1]  She was diagnosed with scoliosis at age ten and underwent two back surgeries in 1999, including a spinal fusion and installation of spinal hardware.  From 2003 through 2014 she worked as a daycare provider and preschool teacher.  [R. 357, 364, 465.]  However, sometime in 2012, her spinal instrumentation failed, which caused her condition to deteriorate.  This required additional surgery, which Plaintiff underwent on April 7, 2014, her alleged disability onset date.  [R. 175, 530.]

### A.     Procedural History

Plaintiff filed an application for DIB on October 15, 2014 alleging that she had been disabled since April 7, 2014.  [R. 175-82, 343-49.]  Plaintiff's application was denied, and she requested a hearing before an Administrative Law Judge ("ALJ").  [R. 183, 194-95.]  She appeared before an ALJ on November 2, 2016 and February 8, 2017, where she was represented by counsel.  [R. 40-85.]  On March 7, 2017, the ALJ issued a partially favorable decision finding Plaintiff disabled from April 7, 2014 through November 7, 2016.  [R. 11-24.]  By decision dated November 9, 2017, the Appeals Council denied Plaintiff's request for review.  [R. 1-6.]  Plaintiff commenced an action before the Honorable Katherine Forrest to appeal the agency's decision. [R. 1298-99; *see Milliken v. Berryhill*, Case No. 17 Civ. 9728.]  By stipulation and order, the case was remanded to the agency for further administrative proceedings.  [R. 1300.]

Plaintiff appeared before the same ALJ for a subsequent hearing on July 1, 2019.  [R. 1231-65.]  By decision dated July 30, 2019, the ALJ issued a partially favorable decision finding

---

[1] Notations preceded by "R." refer to the certified administrative record of proceedings relating to this case submitted by the Commissioner in lieu of an answer.

2

Plaintiff disabled from November 7, 2016, the day after Plaintiff's prior period of disability, through April 22, 2019.  [R. 1209-24.]  Finding disability for a close period, the ALJ reasoned that Plaintiff had experienced medical improvement beginning April 23, 2019, and, therefore, she was no longer disabled from that date.  [R. 1221-22.]  Plaintiff timely commenced the instant action on December 12, 2017.  [Dkt. 1.]

Because the Commissioner found Plaintiff disabled from April 7, 2014 through April 22, 2019, and Plaintiff challenges only the portion of the Commissioner's decision that she was no longer disabled after that period, the relevant period begins April 23, 2019.  Nevertheless, I review the entire body of evidence that was before the ALJ.  *See Ritchie v. Saul*, Case No. 19 Civ. 1378(DF), 2020 WL 5819552, at *2 (S.D.N.Y. Sept. 29, 2020).

### B.      Evidence Prior to the Relevant Period

#### 1.      Medical Evidence Prior to the Alleged Onset Date (April 7, 2014)

Plaintiff underwent two back surgeries in 1999.  The first procedure was a spinal fusion with hardware installation, and the second operation was a corrective procedure to repair the hardware after it broke.  [R. 538.]  Plaintiff met with her primary spinal surgeon, Dr. Matthew Cunningham, on April 17, 2013.  [R. 669-73.]  Plaintiff reported low back pain, which she had been feeling since August 2012 and had been worsening since then.  During a February 26, 2014 follow-up visit, Dr. Cunningham discovered that Plaintiff's spinal implants had broken again. [R. 674-75.]

Dr. Cunningham scheduled Plaintiff for surgery, and Plaintiff met with him and Dr. Chad Craig on March 20, 2014 for a pre-operative checkup.  [R. 538-45, 676.]  X-rays taken that day confirmed that the spinal implants had broken.  [R. 691-94.]  Dr. Craig cleared Plaintiff for surgery.  [R. 538-45.]

### 2. Medical Evidence During First Period of Disability (April 7, 2014 to November 7, 2016)

Plaintiff's surgery took place on April 7, 2014. [R. 561-70.] Dr. Cunningham performed a spinal refusion from T4 to the pelvis with a bone graft, and he removed and replaced Plaintiff's existing spinal hardware. [R. 494-96.] Plaintiff was admitted to the hospital from the day of her surgery through April 14, 2014. [R. 492-535.] A post-operative x-ray taken just after the surgery revealed no abnormalities from the procedure. [R. 636-37.] An x-ray taken on April 14 corroborated the procedure and showed a mild residual s-shaped thoracolumbar curvature and multilevel degenerative disc disease in the lumbar spine. [R. 630-31.]

Following her surgery, Plaintiff attended periodic post-operative checkups with Dr. Cunningham and a pain management specialist, Dr. Syed Husain. On May 22, 2014, Dr. Cunningham noted that Plaintiff was still wearing a back brace, and he recommended that she try to walk, sit, stand, and perform daily activities as much as tolerable. [R. 677.] On June 10, 2014, Dr. Husain noted that Plaintiff was still wearing a back brace and walked with an antalgic gait. She had pain with limitations in her range of motion, for which Dr. Husain prescribed narcotic pain medication. [R. 651-55.] He noted that Plaintiff continued wearing her back brace through July 7, 2014. [R. 645-50.]

On July 9, 2014, Dr. Cunningham opined that Plaintiff had been recovering well after three months, and she was beginning to walk and demonstrate a normal gait. [R. 678-79.] By October 15, 2014, Plaintiff began experiencing increased discomfort, which Dr. Cunningham opined was likely due to over activity. He explained that adults experience "fusion consolidation" between nine to twelve months after a spinal fusion. [R. 680.]

Plaintiff attended a consultative examination with Dr. Greg Grabon, an agency medical

consultant, on December 31, 2014.  [R. 882-85.]  Plaintiff demonstrated a slow gait with a short

step and a limited squat, and she needed help getting on and off of the examination table.  [R.

883.]  She had limited mobility and limited range of neck and back motion.  She had positive

straight leg raising ("SLR") tests,[2] but full range of motion in her extremities.  [R. 884.]  Dr.

Grabon opined that Plaintiff had moderate to marked limitations in bending, lifting, carrying,

pushing, and pulling, and she should avoid heavy lifting.  He gave no opinion on Plaintiff's

ability to walk.  [R. 885.]

Plaintiff continued to attend post-operative follow-up appointments at Crystal Run

Healthcare over the next few years.  On January 21, 2015, she met with Dr. Husain whose

physical examination findings and medication management remained generally unchanged from

her last visit in July 2014.  [R. 888-94.]  Plaintiff met with Lura Wendy Marks, a nurse

practitioner, on February 24, 2015.  Plaintiff demonstrated a normal gait with pain, as well as

swelling, tenderness, and limited back range of motion.  [R. 1105-15.]  These findings remained

unchanged during Plaintiff's April 15, 2015 examination with Nurse Marks.  [R. 1093-1104.]

On May 6, 2015, Plaintiff saw Dr. Sharon Rosenberg for pain in her neck and shoulder.

She was unable to turn her head, and Dr. Rosenberg noted tenderness and spasm in Plaintiff's

neck and right shoulder with limited range of motion.  She assessed possible radiculopathy.  [R.

1076-83.]  On July 15, 2015, Nurse Marks noted that Plaintiff was still being prescribed narcotic

---

[2] "The straight leg raise test 'checks the mechanical movement of the neurological tissues as well as their sensitivity to mechanical stress or compression.'  [G]enerally, in a straight-leg raising test, the patient is in the supine position with the knee and hip extended and there is passive dorsiflexion of the foot, where back pain indicates nerve root compression or impingement."  *McIntosh v. Berryhill*, No. 17 Civ. 5403 (ER)(DF), 2018 WL 4376417, at *3 n.9 (S.D.N.Y. July 16, 2018), *report and recommendation adopted*, 2018 WL 4374001 (S.D.N.Y. Sept. 12, 2018) (citing *Stedman's Medical Dictionary* (updated November 2014) available on Westlaw at STEDMANS 908450).

pain medication to take daily.  She had a normal gait with limited range of motion, as well as pain, swelling, and tenderness in her back.  [R. 1064-74.]

On October 5, 2015, Nurse Marks opined that Plaintiff's physical examination was normal for being 10 months from surgery.  She noted a normal gait with pain, swelling, and tenderness and limited range of back motion.  [R. 1029-31.]  On October 28, 2015, Plaintiff met with Dr. Cunningham and reported pain.  They discussed additional surgery, which Dr. Cunningham did not rule out depending on how Plaintiff continued to heal.  [R. 900-01.]

Plaintiff attended an annual physical on February 10, 2016 with Dr. Riaz Rahman.  He noted that Plaintiff was in good overall health despite her back surgery.  [R. 993-97.]  On March 30, 2016, Plaintiff reported continued back pain to Nurse Marks, who noted that Plaintiff was taking Vicodin and Tramadol daily.  [R. 971-84.]  A CT scan taken August 25, 2016 showed mild degenerative changes in the thoracic and lumbar spinal regions.  [R. 1171-73.]

On September 29, 2016, Dr. Cunningham observed that Plaintiff was still healing from the surgery two years prior.  She had a normal, reciprocal gait with back pain radiating to her left leg.  At the time, she was able to change from a seated to standing position without assistance.  [R. 897-98.]  Dr. Cunningham wrote a letter on October 19, 2016 and stated that Plaintiff would be capable of no more than sedentary work if her symptoms would allow it.  She would need frequent brakes with the opportunity to lie down if her pain became severe, and she would not be able to work for more than three days per week.  [R. 899.]

### 3.  Medical Evidence During the Second Period of Disability (November 8, 2016 to April 22, 2019)

Plaintiff began treating with Dr. Neal Dunkelman on November 8, 2016.  [R. 1201-03.] Plaintiff reported post-operative back and neck pain that would intermittently radiate to her legs,

especially when bending.  She had limited range of motion in her back and negative SLR tests on both sides.  Dr. Dunkelman noted that Plaintiff had good strength and muscle tone.  [R. 1203.] Dr. Dunkelman's physical examination findings remained unchanged on November 28, 2016, and he noted that Plaintiff had been prescribed Tramadol and Hydrocodone to take daily.  [R. 1197-1200.]  On December 22, 2016, Plaintiff stated she still felt pain in her upper and lower back radiating to her neck and legs.  Dr. Dunkelman noted negative SLR tests and limited range of motion.  [R. 1193-96.]

On January 19, 2017, Dr. Dunkelman noted that Plaintiff had called Dr. Cunningham on January 3 because of her pain, which had since stabilized.  Her physical examination was stable except for pain and limited range of motion, and Plaintiff had negative SLR tests.  [R. 1189-92.] These findings were consistent with Dr. Dunkelman's subsequent physical examination findings on February 16, March 16, and April 13, 2017.  [R. 1521-26.]  On May 11, 2017, Dr. Dunkelman noted that Plaintiff had good strength with no muscle atrophy.  [R. 1526-28.]  His findings remained unchanged through June 8 and July 6, 2017, and he noted that Plaintiff's pain was stable on daily narcotic medication but varied in intensity.  [R. 1528-32.]  During this time, Plaintiff attended physical therapy from March 3, 2017 through July 14, 2017.  On discharge, her physical therapist noted that Plaintiff's strength improved, but she still felt pain.  [R. 1700-19.] Dr. Dunkelman's subsequent evaluations on August 3, August 30, and September 28, 2017 were generally unchanged.  [R. 1532-38.]

Plaintiff saw Dr. Cunningham on October 25, 2017.  [R. 1553-54.]  Plaintiff continued reporting back pain radiating to her legs.  Plaintiff had a normal, reciprocal gait, and Dr. Cunningham observed that her wound had healed despite remaining tenderness and spasms.  He opined that Plaintiff's condition was debilitating and prevented her from returning to work.

They discussed increasing Plaintiff's pain management regime and beginning injections. [R. 1554.] Plaintiff saw Dr. Dunkelman the next day, he noted tenderness and spasms despite good strength and muscle tone. [R. 1538-40.]

Based on Dr. Cunningham's recommendation and Dr. Dunkelman's referral, Plaintiff began treating with Dr. Daniel Perri, a pain management specialist, on November 8, 2017. [R. 1570-72.] Plaintiff had a normal gait with mild joint tenderness along the back. Her active range of motion was negative, and she demonstrated a positive SLR test on the right side. Her muscle tone, strength, reflexes, and coordination were normal. [R. 1572.] These findings conformed with Dr. Dunkelman's subsequent physical examinations on November 22, 2017, December 21, 2017, January 18, 2018 and February 15, 2018, showing pain, tenderness, and a positive SLR test on the right side. [R. 1540-49.]

Dr. Perri administered a sacroiliac joint injection on February 20, 2018. [R. 1573.] During a March 8, 2018 follow-up, Plaintiff stated that it had provided some relief, but she still experienced pain on the right side and in her lower back. Dr. Perri assessed sacroiliitis and scoliosis. [R. 1574-75.] On March 20, 2018, Dr. Dunkelman noted pain and tenderness in Plaintiff's back, despite a normal gait. [R. 1549-52.] On the same day, Dr. Perri administered another injection, which Plaintiff tolerated without complications. [R. 1576.] She also saw Dr. Nicholas Avitabile that day for thyroid related treatment. He assessed hypothyroidism due to Hashimoto's thyroiditis and did not conduct a musculoskeletal examination. [R. 1670-71.]

Dr. Perri noted that Plaintiff's pain was not improving during Plaintiff's follow-up examinations on April 23 and May 8, 2018. [R. 1577-80.] He administered another injection on May 22, 2018. [R. 1581.] On July 2, 2018, Plaintiff stated that she still experienced pain, which

was interfering with her sleep.  Dr. Perri's physical assessment remained unchanged from Plaintiff's last visit.  [R. 1582-83.]

Plaintiff began treating with Melinda Sefcik, a licensed medical health counselor, on July 17, 2018 based on Dr. Perri's referral.  [R. 1720-22.]  Plaintiff demonstrated an appropriate appearance with good insight and fair judgment.  She had an anxious mood but was oriented with intact memory and concentration.  Her speech and behavior were normal.  [R. 1720.] Plaintiff was not sleeping well and reported depressive thoughts related to physical and mental trauma from a car accident when she was a child.  [R. 1721.]  Ms. Sefcik assessed moderate major depressive disorder and generalized anxiety disorder.  [R. 1722.]  On July 31, 2018, Plaintiff reported that she was able to go to a Sesame Street amusement park with her younger daughter but experienced increased pain the next day.  [R. 1724.]  Ms. Sefcik noted high anxiety and catastrophic thinking based on a mental status evaluation.  [R. 1723.]  On August 1, 2018, Plaintiff reported to Dr. Perri that her sleep had been improving.  [R. 1583-85.]  Physical examinations that day and on August 31, 2018 remained generally unchanged from Dr. Perri's prior examinations.  [R. 1583-87.]

On September 5, 2018, Ms. Sefcik noted that Plaintiff's stress had increased.  [R. 1725-26.]  Ms. Sefcik noted that Plaintiff's anxiety and communication somewhat improved on September 18, 2018.  [R. 1727-29.]  Plaintiff saw Sean Cavanaugh, a physician assistant, on September 25, 2018 who prescribed Cymbalta.  [R. 1564-69.]  Plaintiff saw Ms. Sefcik on the same day who noted slightly decreased anxiety and opined that Plaintiff had been making positive changes.  [R. 1730-32.]

Plaintiff began treating with Dr. Katherine Kim and Dr. David Harrison on October 5, 2018 for hemorrhoids and symptoms related to constipation.  [R. 1649-60.]  Plaintiff had been

feeling pain and discomfort for weeks.  Examinations on October 9 and 11, 2018 showed anal thickening, likely a chronic fissure, and a decompressed abscess cavity.  Dr. Harrison assessed anorectal abscess and an anal fissure.  [R. 1652-53, 1647.]  Plaintiff met with Ms. Sefcik on October 16, 2018 who observed increased anxiety involving her treatment with Dr. Kim and Dr. Harrison, which she worried might be related to cancer.  [R. 1733-34.]  Dr. Kim performed a colonoscopy and polyp removal on October 23, 2019.  [R. 1634-36.]  On November 20, 2018, Dr. Harrison opined that Plaintiff's anorectal symptoms were likely due to the daily narcotic pain medication she had been prescribed for her back pain.  [R. 1628.]

On November 28, 2018, Plaintiff saw Matthew Lawrence, a physician assistant, after she fell and hurt her foot, causing pain and tingling.  [R. 1623-27.]  Plaintiff walked with a limp had swelling and decreased range of motion in her foot.  [R. 1625-26.]  She was given a cam walker boot, which she wore the next day when she saw. Dr. Perri.  [R. 1590-91.]  Dr. Perri noted that the fall likely exacerbated her back injuries.  He also agreed that Plaintiff's anorectal symptoms were side effects to Plaintiff's narcotic pain medication.  [R. 1590.]  Plaintiff saw Ms. Sefcik the next day who noted that Plaintiff had a stable mood, decreased anxiety, and less catastrophic thinking.  [R. 1737-39.]

Plaintiff attended a post-operative follow-up examination with Dr. Cunningham on December 13, 2018.  [R. 1554-55.]  She still experienced back pain radiating to her legs, and the injections provided only temporary relief.  Her pain worsened if she sat or stood for a period of time.  She continued taking Vicodin twice daily.  She was able to transfer from a sitting to a standing position comfortably.  X-rays and a CT scan taken that day did not show any broken hardware.  [R. 1555.]

On December 31, 2018, Plaintiff met with Dr. Perri who noted that she was scheduled for surgery to treat her abscess and anal fistula. [R. 1592-93.] Plaintiff met with Ms. Sefcik on January 2, 2019 who noted Plaintiff's continued depressive symptomatology and ongoing issues regarding her health and family relationships. [R. 1742-43.] She met with Joseph Ali, a psychiatric nurse practitioner, on January 5, 2019 and was prescribed Wellbutrin. He assessed major depressive disorder. [R. 1559-60.] Dr. Perri noted on January 30, 2019 and February 27, 2019 that Plaintiff continued to experience poor sleep, and her physical examination had remained unchanged from her last visit. [R. 1595-97.]

During a pre-operative visit on February 28, 2019, Dr. Harrison assessed anal fistula and agreed that it had been caused as a side effect of Plaintiff's medication. [R. 1483-89.] He performed an anal fistulotomy on March 4, 2019. [R. 1490-1518, 1699.] The next day, Dr. Harrison noted that the wound was healing. [R. 1608-10.] Plaintiff saw him again on March 14, 2019, and her wound was still healing. [R. 1605-07.] Plaintiff saw Dr. Perri on March 26, 2019 and still experienced pain in her lower back and legs with spasm, tenderness, limited range of motion, and a normal gait. [R. 1598-99.] On April 9, 2019, Dr. Harrison noted that Plaintiff had been healing from her surgery. [R. 1602-04.]

### 4.    Testimonial Evidence

A hearing was scheduled before the ALJ on November 2, 2016. [R. 40-54, *repeated at* 1314-28.] Plaintiff's counsel explained that they had not yet received all of Plaintiff's medical records from her healthcare provider. [R. 45.] As a result, the ALJ postponed the hearing to allow Plaintiff more time to obtain complete records. [R. 49-50.]

A second hearing was held on February 8, 2017 before the same ALJ, and Plaintiff appeared with counsel. [R. 55-85, *repeated at* 1329-59.] Plaintiff testified that from 2004

11

through 2013 she worked as a teacher and assistant teacher in a daycare with children up to age twelve.  [R. 61-64.]  She stopped working from April 2014.  [R. 64.]  She testified that when she was a child, she was diagnosed with scoliosis, which necessitated surgery in 1999.  [R. 68-69.]  She had a spinal fusion surgery on April 7, 2014 and experienced near constant pain in her back, neck, and shoulders as a result.  Plaintiff could not bend, and her mobility was extremely limited.  She testified that, as a result, she spent most of her time lying down.  [R. 69.]  She took Tramadol three times a day and Vicodin twice a day.  [R. 70.]  She also experienced neck pain, and her doctor recently suggested that she begin physical therapy.  [R. 71.]

Plaintiff testified that she would take pain medication every morning and lie in bed until it took effect.  She would then spend her morning helping her children get ready for school before lying back down.  In the afternoon she would help her four-year-old daughter eat lunch. [R. 72-73.]  In the evenings she would help her children with their homework while lying down. [R. 73-74.]  Plaintiff was able to dress herself with the use of assistive devices because she could not bend.  [R. 74-75.]  She relied on her family to do chores and go shopping.  [R. 75.]

### C.    Evidence During the Relevant Period (After April 22, 2019)

#### 1.    Medical Evidence

On April 23, 2019, Plaintiff met with Dr. Perri following her fistulotomy performed by Dr. Harrison.  [R. 1600-01.]  Plaintiff reported that she had still been experiencing pain in her lower and middle back that had been increasing over the past few days.  She continued taking narcotic pain medication daily.  Dr. Perri's physical examination findings were identical to those of Plaintiff's previous visit, as well as each visit she had had with Dr. Perri.  Specifically, Dr. Perri observed that Plaintiff had a normal gait with normal strength, senses, reflexes, and muscle tone.  She had limited range of motion in her back and negative SLR tests on both sides.  [R.

12

1600.]  His assessments of scoliosis, sacroiliitis, and chronic pain syndrome remained unchanged.  Dr. Perri scheduled Plaintiff for another injection.  [R. 1601.]

On June 20, 2019, Plaintiff met with Dr. Sindu Pathrose for pain management.  [R. 1745-48.]  Plaintiff continued experiencing back pain as well as pain beneath her shoulder blades.  Her pain was minimally alleviated with medication and by lying down.  Physical therapy gave her no more than limited improvement, and injections provided temporary relief.  [R. 1745.]  Upon physical examination, Plaintiff was in no acute distress, and she was oriented and cooperative.  Her back was tender to palpation, and Dr. Pathrose noted Plaintiff's surgical scar.  Plaintiff had moderately limited range of lumbar motion and tenderness to palpation along her back, greater on the right than on the left.  She had full strength in her legs with a normal gait.  [R. 1746.]  Dr. Pathrose assessed scoliosis in the thoracolumbar region, sacroiliitis, and chronic pain syndrome.  He recommended that Plaintiff continue opioid pain medication.  [R. 1747.]

On June 24, 2019, Plaintiff met with Ms. Sefcik.  [R. 1749-51.]  Her mental status evaluation remained unchanged from prior visits.  Plaintiff was alert and oriented with an appropriate affect and euthymic mood.  She continued to experience high anxiety and chronic pain.  They continued to discuss Plaintiff's health issues and family relationships.  She diagnosed major depressive disorder and generalized anxiety disorder.  [R. 1750.]

## 2.    Testimonial Evidence

Plaintiff attended a subsequent hearing before the same ALJ on July 1, 2019, where she was again represented by counsel.  [R. 1231-65.]  Plaintiff testified that since 2016, she continued to experience severe chronic back pain on a daily basis.  [R. 1238.]  She continued to take opioid pain medication daily, which provided slight relief, and periodically underwent pain injections, which provided temporary relief.  [R. 1238-39.]  Her medication also caused chronic

constipation resulting in an anal abscess and fistula.  [R. 1239.]  Plaintiff weighed 250 pounds at the time of the hearing, and she had been gaining weight due to immobility.  [R. 1240-41.]  She testified that on a number of occasions she had fallen while trying to walk which aggravated her back injuries.  [R. 1242.]  She also began receiving psychiatric counseling in 2018.  [R. 1243-44.]  She testified that she was the president of her children's parent/teacher association, but she had difficulty attending the meetings which were scheduled for one hour a month in the evenings.  [R. 1245.]

Plaintiff testified that she would spend most of her day lying in bed due to pain.  She continued to take pain medication daily.  She would help her children get ready for school in the morning, help them with their meals, and help them get ready for bed in the evening.  Otherwise Plaintiff would spend her time lying down in bed.  [R. 1246-47.]  On occasions when Plaintiff would leave the house, she would limit her outings to no more than one to two hours due to pain.  [R. 1247.]  She could drive but avoids it due to pain.  [R. 1247-48.]  She could not cook, clean or wash laundry due to pain and immobility.  [R. 1249-50.]  She had difficulty lifting anything heavier than a bottle of soda.  [R. 1255.]

### 3.   Vocational Expert Testimony

Linda Stein, a vocational expert, also testified before the ALJ on July 1, 2019.  [R. 1256-63.]  The ALJ asked Ms. Stein to consider whether a hypothetical individual with Plaintiff's age, educational background, and job history could perform jobs in the national economy at a given RFC.  First, the ALJ asked her to consider an individual who could perform sedentary work and could climb, push, pull, bend, balance, kneel, crouch, and crawl occasionally, could work in a low stress job containing no more than simple, routine, repetitive tasks and few workplace changes, and could only work three days a week.  [R. 1256-57.]  Ms. Stein testified that this

14

individual would not be able to perform full-time, gainful work in the national economy because working three days per week would constitute full-time work.  [R. 1257.]

Second, the ALJ asked Ms. Stein to consider the same hypothetical RFC but removed the limitation of working no more than three days per week.  [R. 1258.]  Ms. Stein testified that this individual could perform the following unskilled jobs as listed in the *Dictionary of Occupational Titles* ("DOT"): envelope addresser (DOT No. 209.587-010), telephone order clerk (DOT No. 209.567-014), and charge account clerk (DOT No. 205.367-014).  [R. 1258.]

## III.  LEGAL STANDARD

### A.     Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide de novo whether a claimant was disabled."  *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard."  *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

The substantial evidence standard is more deferential than the "clearly erroneous" standard.  *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Lamay v. Commissioner of*

*Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted).  "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted.  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

**B.      The Five Step Sequential Analysis**

A claimant is disabled under the Social Security Act when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In addition, a person is eligible for disability benefits under the Social Security Act only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  *Id.* § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); *see* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).  The claimant bears the burden of proof as to the first four steps of the process.  *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).  If the claimant proves that his or her impairment prevents him or her from performing his past work, the burden shifts to the Commissioner at the fifth and final step.  *See id.*  At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy.  *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

A claimant's "residual functional capacity" ("RFC") is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Social Security Ruling ("SSR") 96-8p,

1996 WL 374184, *2 (July 2, 1996)).  When assessing a claimant's RFC, an ALJ is obligated to consider medical opinions on a claimant's functioning based on an assessment of the record as a whole.  20 C.F.R. §§ 404.1527(d)(2), 416.9527(d)(2) ("Although we consider opinions from medical sources on issues such as …your residual functional capacity…the final responsibility for deciding these issues is reserved to the Commissioner.").  It is the Commissioner's role to weigh medical opinion evidence and to resolve conflicts in that evidence.  *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

## C.    Weighing Medical Evidence[3]

When considering the medical opinion evidence, the ALJ must give deference to the opinions of a claimant's treating physicians.  A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 416.927(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider the following factors to determine the amount of weight the opinion should be given: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating

---

[3] On January 18, 2017, the Commissioner published "Revisions to Rules Regarding the Evaluation of Medical Evidence," effective March 27, 2017.  82 Fed. Reg 11, 2017 WL 168819 (Jan. 17, 2017).  The Revisions altered certain longstanding rules for evaluating medical opinion evidence for cases filed after March 27, 2017.  *Id*. at *5844.  Plaintiff protectively filed her applications on October 15, 2014, and, therefore, the Revisions do not apply.  *See Ben v. Berryhill*, No. 17 Civ. 8345 (DCF), 2019 WL 1447892, at *7 (S.D.N.Y. Mar. 19, 2019 (finding that the Revisions did not apply where the claimant filed her initial application prior to the effective date, succeeded at the federal level, the case was remanded and reheard after the effective date, and she subsequently appealed to the federal level again.).

physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the

physician's level of specialization in the area, and (6) other factors that tend to support or

contradict the opinion.  20 C.F.R. § 416.927(c)(2)-(6); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d

Cir. 1993).

Although the foregoing factors guide an ALJ's assessment of a treating physician's

opinion, the ALJ need not expressly address each factor.  *Atwater v. Astrue*, 512 F. App'x 67, 70

(2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor

where the ALJ's reasoning and adherence to the regulation are clear.") (citing *Halloran v.

Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam)).  As long as the ALJ provides "good

reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is

supported by substantial evidence, remand is unwarranted.  *See Halloran v. Barnhart*, 362 F.3d

28, 32-33 (2d Cir. 2004).

### D.     Closed Periods of Disability and Medical Improvement

A "closed period" of disability occurs where a claimant is found by the Commissioner to

be disabled for a finite period of time which began and ended prior to the date of the agency's

administrative determination of disability.  *Smith v. Berryhill*, Case No. 17 Civ. 5639

(PAE)(SN), 2018 WL 5619977, at *12 (S.D.N.Y. Aug. 10, 2018), *report and recommendation

adopted*, 2018 WL 4565144 (S.D.N.Y. Sept. 24, 2018).  Where a claimant is found to be

disabled, the Commissioner may find that he or she is no longer disabled from a later date where

substantial evidence of "medical improvement" supports the conclusion that the claimant has

become able to work.  *Ritchie v. Saul*, Case No. 19 Civ. 1378 (DF), 2020 WL 5819552, at *11

(S.D.N.Y. Sept. 29, 2020) (citing 20 C.F.R. § 423(f)(1)).

The regulations define "medical improvement" as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [he or she was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1).  To determine whether a claimant's medical condition has improved, the agency "must compare 'the current medical severity of th[e] impairment [ ] ... to the medical severity of that impairment[ ] at th[e] time' of the most recent favorable medical decision." *Veino v. Barnhart*, 312 F.3d 578, 586-87 (2d Cir. 2002) (quoting 20 C.F.R. § 404.1594(b)(7) (alteration in original)).  The relevant inquiry is whether the claimant's condition improved from the date of the most recent decision finding disability.  *Corwell v. Astrue*, Case No. 08 Civ. 8019 (LTS)(DF), 2010 WL 7765355, at *12 (S.D.N.Y. Jul. 23, 2010).

Generally, the medical improvement standard under 20 C.F.R. § 404.1594 applies to continuing disability reviews regarding a prior adjudication.  *Cook v. Colvin*, Case No. 13 Civ. 1946 (TPG), 2015 WL 5155720, at *9 (S.D.N.Y. Sept. 2, 2015) (citing *Veino*, 312 F.3d).  The Second Circuit has not yet addressed whether the medical improvement standard also applies to closed period cases, but other circuits have held that the standard is appropriate for such cases. *See Carbone v. Astrue*, Case No. 08 Civ. 2376 (NGG), 2010 WL 3398960, at *13 (E.D.N.Y. Aug. 26, 2010) (collecting cases from the Courts of Appeals of the Third, Seventh, Tenth, and Eleventh Circuits applying the medical improvement standard to closed period cases).  Courts within the Second Circuit, including this District, also routinely apply the medical improvement standard to close period cases.  *See, e.g.*, *Cook*, 2015 WL 5155720, at *9; *see also Carbone*, 2010 WL 3398960, at *13; *Chavis v. Astrue*, Case No. 07 Civ. 0018 (LEK), 2010 WL 624039, at *5 (N.D.N.Y. Feb. 18, 2010).  Moreover, neither party contests that the standard governs this

case, and the ALJ applied this standard in his July 30, 2019 decision. [R.1204-24.]  The Court, therefore, applies this standard.

### E.     Medical Improvement and the Eight Step Sequential Analysis

Where an ALJ determines that a claimant seeking DIB has experienced a medical improvement and, therefore, is no longer disabled from a certain date, the ALJ must apply an eight step sequential analysis.  *Ritchie*, 2020 WL 5819552, at *1 (citing 20 C.F.R. § 404.1594(f)(1)-(8)).[4]  Similar to the five step process outlined above, the eight step medical improvement standard first asks the ALJ to determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1594(f)(1).  If the claimant has not engaged in substantial gainful activity, the second step requires the ALJ to consider whether the claimant has an impairment that meets or equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant has such an impairment, then the claimant's disability will be found to continue.  20 C.F.R. § 404.1594(f)(2).  If the claimant does not suffer from such an impairment, the ALJ proceeds to the third step, which requires the ALJ to determine whether there has been a medical improvement as defined by paragraph (b)(1) of this section of the regulations.  20 C.F.R. § 404.1594(f)(3); *see supra* 20 C.F.R. § 404.1594(b)(1).

If there has been a medical improvement, the ALJ proceeds to the fourth step and must determine whether the medical improvement is related to the claimant's RFC, based on the impairment that was present at the time of the most recent favorable medical determination.  20 C.F.R. § 404.1594(f)(4). If the ALJ concludes at step three that there was no medical improvement, or concludes at step four that the medical improvement was unrelated to the

---

[4] Administrative determinations concerning applications for Supplemental Security Income under Title XVI use a similar seven step sequential analysis not applicable here.  *See* 20 C.F.R. § 416.994(b)(5).

claimant's RFC, the ALJ proceeds to the fifth step to determine whether the claimant should be

denied disability due to a regulatory exception listed under 20 C.F.R. §§ 404.1594(f)(5)(d) and

(e).  20 C.F.R. § 404.1594(f)(5).  Those exceptions are:

1.     The claimant is the beneficiary of advances in medical or vocational therapy or technology.

2.     The claimant underwent vocational therapy related to his or her ability to work.

3.     New and improved diagnostic or evaluative techniques reveal that the claimant's impairments were not disabling at the time it was considered during the most recent favorable decision.

4.     The prior disability decision was in error.

5.     The claimant is currently engaging in substantial gainful activity.

6.     The prior decision was fraudulently obtained.

7.     The claimant refuses to cooperate with the agency.

8.     The agency is unable to find the claimant.

9.     The claimant failed to follow prescribed treatment which would be expected to restore his or her capacity to work.

20 C.F.R. §§ 404.1594(f)(5)(d) and (e).  If none of the exceptions apply, then the ALJ must find

that the claimant's disability will continue.  20 C.F.R. § 404.1594(f)(5).

If one of the last four exceptions apply, then the ALJ must find that the claimant is no

longer disabled.  If the ALJ finds at step four that the medical improvement was related to the

claimant's RFC, or at step five that one of the first five exceptions apply, the ALJ will proceed to

step six.  20 C.F.R. § 404.1594(f)(6).  At step six, the ALJ considers whether all impairments in

combination significantly limit the claimant's ability to do basic work activities.  20 C.F.R. §

404.1594(f)(6).  If the impairments are found to be severe, then the ALJ proceeds to the seventh

22

step and must determine whether the claimant is able to perform past relevant work.  20 C.F.R. §
404.1594(f)(7).  If the claimant can perform his or her past relevant work, he or she is found to
be no longer disabled.  If the claimant cannot perform his or her past relevant work, then the ALJ
proceeds to the eighth step to determine whether the claimant can perform any other work.  If the
claimant can perform other work, then the ALJ will find that the disability has ended.  20 C.F.R.
§ 404.1594(f)(8).

> **F.     The Presumption of Continuing Disability**

Paramount to the medical improvement standard is the presumption that when the agency
finds a claimant disabled, that disability will continue.  Furthermore, unlike cases involving the
five step sequential analysis, the burden is with the agency to prove that the claimant is no longer
disabled.  "Once a claimant establishes the existence of a disabling condition, the medical
improvement standard shifts the burden of proof to the Commissioner; a claimant is entitled to a
presumption that the classification will not change unless the condition, governing statutes, or
regulations change."  *Cook*, 2015 WL 5155720, at *9 (citing *De Leon v. Sec'y of Health and
Human Servs.,* 734 F.2d 930, 937 (2d Cir.1984)).  "[U]nder the medical improvement standard,
the government must, in all relevant respects, prove that the person is no longer disabled."  *Id.*
(citing *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir.2002)).

The Second Circuit has cautioned that benefits may not be terminated "simply on the
whim of a changed ALJ."  *De Leon*, 734 F.2d at 937.  To that end, the claimant has no
corresponding burden to prove that he or she is still disabled.  "The Commissioner may not
'simply disregard a prior finding that a particular medical condition is disabling' and terminate
benefits 'based solely on substantial evidence that the claimant is not currently disabled, without
regard to whether there has been demonstrable medical improvement in the claimant's

condition.'"  *Serrano v. Colvin*, Case No. 16 Civ. 6295 (CBA), 2018 WL 1440540, at \*3

(E.D.N.Y. Mar. 22, 2018) (citing *De Leon*, 734 F.2d at 936-37).  Therefore, where the

Commissioner fails to meet his burden of proof, the presumption that a claimant is disabled will

stand.  *Id.*  Moreover, a finding of medical improvement must be supported by substantial

evidence.  *Nascimento v. Colvin*, 90 F. Supp. 3d 47, 53 (E.D.N.Y. 2015)).

### G.       Remand for Calculation of Benefits

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Court has the "power to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

the decision of the Commissioner, with or without remanding the cause for a rehearing."  42

U.S.C. § 405(g); *Shalala v. Schaefer*, 509 U.S. 292, 297 (1993); *Melkonyan v. Sullivan*, 501 U.S.

89, 98 (1991).  A remand for further proceedings may be ordered pursuant to the fourth sentence

of 42 U.S.C. § 405(g) in cases where the Commissioner "has failed to provide a full and fair

hearing, to make explicit findings, or to have correctly applied the law and regulations."

*Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991); *see Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d

Cir. 1999).

The Court also has authority under § 405(g), sentence four, to remand solely for

calculation of benefits when the record provides "persuasive evidence of total disability that

render[s] any further proceedings pointless."  *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 590-91

(S.D.N.Y. 2000).  Further, if the ALJ's decision is based upon an error of law and "where

application of the correct legal principles to the record could lead to only one conclusion, there is

no need to require agency reconsideration," *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)

(citing *Havas v. Bowen*, 804 F. 3d 783, 786 (2d Cir. 1986)).  In such cases, a remand solely for

the purpose of calculating benefits is appropriate.  *Balsamo v. Chater*, 142 F.3d 75, 82 (2d Cir. 1998); *Parker v. Harris*, 626 F. 2d, 225, 235 (2d Cir. 1980).

The Court's determination whether to remand for further administrative proceedings or for a calculation of benefits is discretionary.  *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004).

## IV.  DISCUSSION

### A.      The ALJ's Decisions

In his March 7, 2017 decision, the ALJ found Plaintiff disabled from April 7, 2014, her alleged disability onset date, through November 7, 2016, reasoning that her disability had ended. [R. 7-24.]  Upon remand, the Appeals Council affirmed the ALJ's finding of disability and vacated the case to consider whether Plaintiff was disabled from November 8, 2016.  [R. 1305-13.]  Subsequently, by decision dated July 30, 2019, the ALJ found Plaintiff disabled from November 8, 2019 through April 22, 2019.  [R. 1204-24.]

The ALJ applied the five step sequential analysis for the period of disability.  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 8, 2016. [R. 1213.]  Second, the ALJ found that Plaintiff suffered from degenerative disease of the thoracolumbar spine with a history of scoliosis, obesity, major depressive disorder, and anxiety disorder, but that her impairments did not meet or equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 1213-16.]  Next, the ALJ assessed Plaintiff's RFC and found that she could perform sedentary work, but she could only occasionally climb, push, pull, balance, bend, kneel, crouch, and crawl.  She could also only work in low stress jobs limit4ed to simple work, and she could only work three days per week.  [R. 1216.]  The ALJ then determined that Plaintiff could neither perform her past relevant work as a preschool

teacher, nor any work in the national economy.  [R. 1220-21.]  Consequently, the ALJ found

Plaintiff disabled through April 22, 2019.  [R. 1221.]

For the period beginning April 23, 2019, the ALJ applied the eight step sequential

analysis and determined that Plaintiff's disability had ended on that date.  The ALJ determined

that Plaintiff had not developed new impairments since April 23, 2019, and that her impairments

had not met the listing requirements.  [R. 1221.]  Moving to the third and fourth steps, the ALJ

found that Plaintiff's condition had improved as of April 23, 2019, and that that improvement

related to Plaintiff's ability to perform work.  [R. 1221-22.]  Finding that step five did not apply,

the ALJ found at step six that Plaintiff's RFC had changed such that Plaintiff was no longer

limited to working only three days per week.  [R. 1222-23.]  At step seven, the ALJ found that

Plaintiff could not perform her past relevant work.  [R. 1223.]  At step eight, the ALJ found that

Plaintiff could work as an addresser, a telephone order clerk, or a charge account clerk.  [R.

1223-24.]  Consequently, the ALJ found that Plaintiff was no longer disabled.  [R. 1224.]

### B.    This Case Will Be Remanded for Calculation of Benefits

The parties agree that the ALJ's medical improvement assessment must be reversed and

disagree only as to the scope of the necessary remand.  Plaintiff argues that, because the medical

improvement analysis is not supported by substantial evidence, Plaintiff's disability is presumed

to continue, and that she should be awarded benefits without further administrative proceedings.

The Commissioner concedes that "the record lack[s] sufficient medical evidence[,]" but argues

that the case should be remanded so the Commissioner can "direct the ALJ to reevaluate whether

Plaintiff experienced medical improvement, by acquiring a medical expert opinion, re-evaluating

the opinion evidence, and reassessing Plaintiff's RFC." [Dkt. 17, pp. 2-4.][5]  In opposing the more

limited remand sought by Plaintiff, the Commissioner asserts that the record "does not contain

persuasive proof of disability for the period beginning April 23, 2019" and that broader remand

"would allow the Agency to obtain a medical expert to review the newer evidence[.]"   [Dkt. 17

at 4.]

The Court concludes that the Commissioner is not entitled to a further bite at the apple.

First, in exercising discretion under § 405(g) (sentence four), a court properly considers "the

procedural posture of a case, and particularly which party bears the burden of proof and

production on issues of disability."  *Andrew S. v. Saul*, 5:19-CV-0570 (LEK), 2020 WL 6709833

at *7 (N.D.N.Y. Nov. 16, 2020), *quoting Diaz v. Berryhill*, 388 F.Supp. 3d 382, 392 (M.D. Pa.

2019).  Thus, as a general matter, remanding solely for calculation of benefits is more likely to

be appropriate in medical improvement cases because the plaintiff's disability has already been

established and is presumed to continue.  In these cases, persuasive proof of disability is a matter

of record, and if "the Commissioner has already clearly failed to develop evidence of decreased

medical severity as of the alleged date of medical improvement, remand for the calculation of

benefits . . . could be warranted even if the claimant points to no positive evidence of disability

after the alleged medical improvement date."  *Andrew S.*, 2020 WL 6709833 at *7.  The

Commissioner's argument here that remand for further inquiry is appropriate because the record

_____

[5]The Commissioner's terse memorandum is notably vague as to the precise nature of the error requiring remand.  The Commissioner purports to defend the ALJ's rationale (improved examination findings) for his medical improvement assessment at Step Three, then asserts that "it is not clear how these improved findings translate into increased ability to sustain work over five days, as opposed to three[,]" a statement which implicates the ALJ's RFC analysis at Step Seven of the Eight Step medical improvement standard. [Dkt. 17, p. 3.] However, the Commissioner proposes that, upon remand, the ALJ should revisit his Step Three assessment by  "reevaluat[ing] whether Plaintiff experienced medical improvement." [Dkt. 17, pp. 3-4.]

"does not contain persuasive proof of disability for the period beginning April 23, 2019 " [Dkt. 17, p. 4] turns the medical improvement standard on its head by calling upon Plaintiff to prove again her previously established (and presumptively continuing) disability.

Courts also look to the age and procedural history of a case in determining whether a remand for further administrative proceedings is appropriate. *Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000) (remand for calculation of benefits "particularly appropriate" to avoid "substantial, additional delay" in six year old case); *Andrew S.*, 2020 WL 6709833 at *8 (appropriate to consider both time case pending and "number of appeals and remands" in case history).  Here Plaintiff, who filed her application for disability benefits in October 2014, has participated in two rounds of administrative hearings leading to two appeals to federal district court, each appeal in turn culminating in a confession of error by the Commissioner requiring remand.  These considerations support a more limited remand this time around.

Here, the Commissioner concedes that no medical opinion evidence supports the ALJ's conclusion that plaintiff's condition has improved.  Instead, we are left with the ALJ's lay interpretation of raw clinical findings, and '[i]n the absence of supporting medical opinion, the ALJ should not . . . engage[] in his own evaluation of medical findings." *Filocomo v. Chater*, 944 F.Supp. 165, 170 (E.D.N.Y. 1996).  As Plaintiff argues, the Commissioner "had every opportunity to obtain a medical expert after the previous District Court remand." [Dkt. 18, p. 3.] Remanding now to "enable the ALJ to fish for evidence justifying the denial of benefits" is simply not appropriate. *Andrew S.*, 2020 WL 6709833 at *7.

## V.  CONCLUSION

For the forgoing reasons, Plaintiff's motion is **GRANTED**, and Defendant's motion is

**DENIED**.  The Court remands this case for calculation of benefits.  The Clerk of Court is

directed to terminate the pending motions [Dkt. 12 and 17] and close this case.

Dated: March 17, 2021
       White Plains, New York

SO ORDERED

_____
Paul E. Davison
United States Magistrate Judge